Good morning, Your Honor. I'm Albert Chang with the law firm of Bottini & Bottini in San Diego, appearing on behalf of Appellant Mr. Lako. I would like to reserve five minutes for rebuttal. All right. I'll try to help you out, but you're in charge of your own time. Thank you. May it please the Court, the key issue in this appeal is whether the District Court has done enough to scrutinize all indicia of collusion in granting final approval of a Class Action Settlement. In Bluetooth, this Court instructed the District Courts to look for not only evidence of explicit collusion, but also, and I quote, more subtle signs. District Court was well aware of Bluetooth and laid out a pretty detailed analysis of Bluetooth. So where did the District Court err in that analysis? Well, the District Court erred at least in three regards. First, Class Council sought and obtained a $5,000 incentive award on behalf of Class Council's starter plaintiff, Mr. Dobin, by concealing that Mr. Dobin was an in-and-out trader. Under clear case law, in-and-out traders are subject to unique defenses. Did you raise that issue below? We did not, Your Honor. But that doesn't matter in the sense that we were not able to raise it due to Class Council's concealment of the in-and-out trader status of Mr. Dobin. And on top of it, the PSRA, in its language, requires that the— Part of the problem that I have with your case is the way that this case is litigated here in the Ninth Circuit, because you're raising a lot of arguments for the first time. And in fairness to the District Court, you didn't give the Court a chance to address any of these issues on the notice issues, on the analysis in Bluetooth. All these—so many arguments are being raised here for the first time. So why shouldn't we deem them all waived or forfeited? Well, because Bluetooth instructs all courts, including this court, because it's a binding precedent, to scrutinize all indicia of implicit and explicit collusion. This court is essentially a court of error. It has to—we're trying to do justice here in a sense that the District Court approves the settlement. This court can take a second look. And you look at the issue of the $5,000 incentive award for Mr. Dobin. The PSRA, by statute, requires that the District Court must find evidence of, and I quote, reasonable costs and expenses directly relating to the representation of the class. This is a legal issue. This is not waivable. The District Court here awarded a $5,000 incentive award to a plaintiff that cannot serve as a class representative. That is wrong, and this court must reverse just based on that issue alone. Now, as this court— Is there a factual finding embedded in that argument of yours? So, for example, with regard to whether he is, in fact, an in-and-out traitor, do we make factual determinations here for the first time? Or is it something that you're saying should be sent back to the District Court for reanalysis? Well, my answer is twofold. One, there's no need for factual finding in the sense that Mr. Dobin's in-and-out traitor status is apparent on the record. It's on his face. Mr. Dobin sold all his stock during the class period and sold in June of 2021, two months before the end of the class period. And to the extent that there needs to be factual finding, yes, remand is appropriate because the District Court can take a first look as to Mr. Dobin's in-and-out traitor status. Now, this court cautioned in Rodriguez that any service awards class representatives must be scrutinized to ensure that there's adequacy of representation of the class by the representatives. And this is also the rule in Staten. This court rejected in Staten a settlement agreement where the awards request indicated that class representatives were, and I quote, more concerned with maximizing their incentives than with judging the adequacy of the settlement as it applies to the class members, end of quote. So in addition to these cautionary rules, as I indicated, the PSRA imposes a statutory limit on any recovery by class representatives to their pro rata share in the settlement plus, and I quote, any reasonable costs and expenses, including lost wages, directly relating to the representation of the class. Now, the District Court here did not have any evidence of Mr. Dobin's involvement in the case, nor did the District Court has any evidence as to how much reasonable costs and expenses Mr. Dobin incurred in connection with representing the class. Our point is that Mr. Dobin cannot represent the class at all because he was an in and out trader. And the case was crystal clear about it. The fact that my friends here said, oh, well, there was a curative disclosure before Mr. Dobin sold. That doesn't matter because that requires this court's reliance on the partial disclosure theory of class counsel's case. And there's no such reliance can be made here because at the outset, Mr. Dobin was an in and out trader. If Mr. Dobin was put up as a lead plaintiff at the very inception of the case, his application would have been rejected. Now, moving on from Mr. Dobin's inadequacy, class counsel here also manipulated the plan of allocation in favor of the lead plaintiff, Mr. Lathrano. Class counsel allocated $2.99 of damages for Mr. Lathrano's purchase period. Now, that manipulation is contrary to class counsel's own experts' analysis. Class counsel's own experts' analysis said that there was only one disclosure at the very end of the class period in August 3rd. Mr. Lathrano was not entitled to recover $2.99 per share simply because he was lead plaintiff and simply because he was represented by class counsel. Now, I think there are multiple indicia of collusion in this proposed settlement. The indicia include Mr. Dobin's service award that violated the PSRA, the use of Mr. Dobin's wife to submit a declaration regarding absent class members' reaction to the settlement, the plan of allocation, as I said, that benefits Mr. Lathrano in contravention with the damages analysis of class counsel's own expert, and the absence of any expert damage analysis before the filing of the preliminary approval papers. Now, under Bluetooth, the district court was required to conduct a searching inquiry of all indicia of possible implicit collusion in scrutinizing class action settlement because this settlement was reached before class certification, but the district court here failed to conduct a searching inquiry, and multiple indicia of collusion metastasized to other aspects of the proposed settlement. So, on those basis, we urge this court to reverse and remand. I will reserve the remainder of my time. Thank you, counsel. Good morning, your honors. May I please the court? One of the key problems with every issue raised by my adversary on this appeal is that none of that, none of this was raised below. All of a sudden, what's only metastasized in this court is the arguments objecting to the settlements of this case. Laco has been a member of the class. He initiated this action at the start of the case. He objected to preliminary approval of the settlement. He put in opposition to preliminary approval. He objected to final approval, and you don't hear anything in those papers about collusion being alleged. You don't hear anything, any complaint about the compensatory award. You don't hear any complaints about Dobin's status as an in-and-out trader. None of this is raised to the court below, and so the counsel and Laco had an opportunity to raise all these issues at the district court in aid to doing a searching inquiry and simply failed to do so. So, let's break it down point by point. One, Dobin being an in-and-out trader. There's simply, he's not an in-and-out trader. He purchased during the class period before multiple corrective disclosures and sold after multiple corrective disclosures. That is not an in-and-out trader. An in-and-out trader is one who purchases and sells prior to any corrective disclosure. Mr. Dobin would be an adequate class representative, and counsel here had every opportunity to argue against his adequacy before the court on the record. We didn't hide his trades. It was on a certification filed in front of this court. Remind me, during this process, he was appointed by the district court as a class representative. Yes, he was. He was at preliminary approval. He was approved, and counsel and Laco did not file any objection to his status as a class representative. Where was he? Why didn't he raise these issues? The only thing that's misstatisticizing are his arguments in opposition to the settlement. He says that there was no damages analysis put when we filed our initial motion papers. Counsel for Laco here never files settlement papers with a damages analysis for preliminary approval or final approval. Only after he raises issues, then we've had the report filed. The indication regarding estimated damages was an informal work that we had done by the  It was actually in paper form that was submitted to us, and then we had it formalized in the declaration in support of preliminary approval. As far as manipulating the plan of allocation, once again, never raised at the district court. The plan of allocation is not manipulated. We simply gave the hire, at all instances, in the plan of... Can you address the argument raised on appeal regarding the lowball settlement offer in the Cornerstone report? Sure, Your Honor. You have a settlement of, we put in the maximum estimated damages as $32 million. That wasn't manufactured at preliminary approval. That was in our Rule 26A disclosures. The maximum we felt any class member can get was $32 million. This settlement is $3.5 million. Cornerstone has analysis saying that when settlements include a Section 10 and 11 claim, those settlements range between 6% and 7%. Here, the 11% we achieved for the class is better than that. But we should really look into, how does that $32 million, how is that broken down? That assumes that all of our alleged corrective disclosures, many of which are not statistically significant, are upheld by this court and are upheld by the court below. Your Honor, that is pie in the sky. The damages here, after experts and after discovery, very well could have been $7 million. Very well could have been $6 million. Actually, Laco, when he argues that there's only one corrective disclosure, which he points to an alternative damage analysis put in by our expert, he says there's only one corrective disclosure, August 3rd. If that's true, that there's only one corrective disclosure, the class-wide damages are $7.29 million. Then you compare the $3.5 million to $7.29 million, that's 59%. In no universe is 59% an inappropriate settlement. And quite frankly, in no universe is 11% of damages in inadequate settlement. What's lacking from Laco's papers is his own damages analysis. What does he think damages are? What does he think the total damages are in this case? Did he ever do that work? Even if it were the $47 million that he says the full Section 11 damages should be, he's still dealing with a settlement that's in the 6% to 7% range, which has also been endorsed by Cornerstone. There's no level, there's no analysis here that does not support approval of the settlements. Each and every issue that's been raised by, that we heard my adversary speak about today, has been some newly manufactured problems with the settlement that he didn't have, that he didn't raise below. And he didn't even show up to the preliminary approval hearing below at the District Court at the final approval. I thought he did challenge the expert, expert and I. He challenged that we, yes, he challenged that we didn't put in the Nye report at the outset of the case, and he said there were distinctions between the expert report and the plan of allocation. That's correct. I'm not sure, so is it your position that he didn't challenge the validity of Nye's estimation of damages below? Yeah, he doesn't. All he says is that there's a contradiction between the plan of allocation and the damages report by Nye. He doesn't submit his own report. And certainly the issues regarding the plan of allocation, the discrepancies between the plan of allocation and Nye's report are simply because Nye, at all points, uses a hire of Section 11 and Section 10b. He operates by that rule, and he operates by another rule, that he only uses one date as a disclosure date. I ask that because, frankly, looking through the Nye report, it's really hard to understand what he's even saying on some points. And so I'm trying to figure out if the district court didn't have detailed or specific arguments challenging Nye's methodology or his conclusions, then, you know, I guess I would agree with your argument that the district court got sandbagged, right, by trying to raise arguments up here. But it's not clear to me that that's what the record is, that there were no challenges to Nye's methodology or conclusions. There were challenges to Nye's methodology, and each of them were answered, Your Honor. He had challenged our use of the May 14th cutoff for Section 11, and we gave it reason. Under SLAC, you simply... Once you have unregistered shares that come into the market, under SLAC in the Ninth Circuit, it's virtually impossible to allege that you have Section 11 standing. So Section 11, we cut off at May 14th. He did state certain points that we should use both Section 11 damages and 10b, we should show both. And Nye stated we're going to use the higher of Section 11 and Section 10b at each point. And then the only other issue was, is that we have more corrective disclosure dates in the Nye report than in the plan of allocation, and that's because we used only one day for corrective disclosure. We did not use multiple days. All of those issues were raised at the district court with respect to Nye. All of those were answered multiple times below in our preliminary approval and final approval papers. There was no question brought to Nye or about Nye's report that was not answered by our papers. And the court had gone through those issues and found that we did adequately answer those issues. If there's nothing further, I'll rest. Thank you. Thank you. Good morning. Daniel Ladler on behalf of Loan Depot and the other defendants. So I'll address each of the points in order. I'll start with the service award. That issue was forfeited. It was not raised below. The district court didn't have an opportunity to address it. The notion that the in-and-out trader status was concealed is incorrect. There's an attachment to the operative complaint that indicates when Mr. Dobin bought and when he sold his shares. That's page 1077. Mr. Dobin is also all over the complaint. He's on the caption. There's a paragraph explaining that he's an additional plaintiff in the case. He's in the notice. There's no concealment of this guy's involvement in the case. I also agree with my colleague that he suffered the same injury if in fact anyone suffered injury here as the rest of the class because he sold after a supposed corrective disclosure. So this really just amounts to a weak and forfeited adequacy argument. There's also evidence. I heard a question about is there evidence that he actually performed any service to the class? There is. He has a declaration in the record that's pages 285 to 287 explaining that he spent something like 30 hours on the case, that if he had not spent that time, he would have used it profitably in his other investment activities. That's the sort of service award that we generally think is merited and we're talking about the standard $5,000 service award. We're not talking about a service award like in the Staten case where 29 plaintiffs were set to get $30,000 each and it would have been 6% of the total damages award. We're not talking about Rodriguez, which was these are cases my colleague on the other side raised. Rodriguez was a case involving an incentive agreement. That's a case where I suppose you might say that the incentives were skewed because in that case the plaintiffs were going to be awarded up to $75,000 so long as the settlement was $10 million or above and at that point they didn't really have a great incentive to push for more. The rest of the class would have liked more but they were going to get their 75 if it was just 10 and so this court said we don't like that. We would prefer that the incentives of the class members and their representatives be aligned. There's no problem here. All we have is a standard service payment. If you get to the plan of allocation, this whole notion that there's any mismatch between the plan of allocation and the damages estimate is entirely because my colleague on the other side is focusing on the secondary estimate of the expert which is the one that frankly from the perspective of the defendants we think is more realistic, more likely. So that secondary damages estimate says here's what I'm going to do. I'm going to take the more realistic, more sophisticated model, the multi-trader model. I'm going to look only at disclosures that result in an impact the next day. I'm not going to assume that the market takes like a week to respond to bad news especially when the supposed disclosures here were earnings reports which is something that the market is reacting to essentially in real time and I'm only going to look at statistically significant events that result from these supposed disclosures. When you put all those things together, those assumptions, you get to something like six million bucks and that's where that 59% comes in. So this is a very healthy settlement by that measure. What my colleague here representing the plaintiff says is we agree a pie-in-the-sky number, 32 million, it's still a healthy measure even according to that denominator and so if you have any questions, Judge Forrest, specifically about Mr. Nye's analysis, I'm happy to answer those but that's basically the difference between the two damages estimates is one is sort of the pie-in-the-sky number that with all the generous assumptions given to the plaintiffs and the other is a much narrower conservative estimate that frankly is more consistent with the defendant's understanding of the case that damages here would be zero or maybe up to something like six million, a three and a half million dollar settlement. I'll just say that it would have been helpful to have your summary that you just gave when I was studying the report. Yeah, understood and the district court did, I think, understand these issues well which is evidenced on pages 52 to 54 of the record, addressed all of the complaints that were raised below by the objector Finally, I want to echo the point about why is there a distinction, intra-class distinction across certain class members? Why are some people recovering more? And the district court addressed this too. The principal reason is that certain people here had stronger claims than others and the ones who had the strongest claims were those who could sue under section 11. Section 11 is a very powerful tool. It offers statutory damages. That's great if you can sue under it but not everybody can sue under it. Under the Slack decision from the Supreme Court and then coming back on remand from this court, you essentially have to prove you bought registered shares, only registered shares. That might be easy to do if the only shares in the market are registered shares because the IPO just happened. But as soon as the lockup period ends, and in this case there were something like four million shares sold in the IPO and then 90 days later up to six million shares could be sold by insiders and early investors. As soon as that lockup expires, it's essentially impossible to prove you bought only registered shares. And so what the expert did here is he said, well, those people who could sue early on because they were early holders, they're going to have strong claims. We're going to reward them with an additional payment. Whereas other people, they're going to have only a section 10 claim. And as we all know, that's a lot harder to prove because you have to prove scienter. That is not an element of a section 11 claim. So it's not like this was an irrational or arbitrary distinction across class members. The people who have the strongest claims are being rewarded and the class in general is getting a healthy settlement. If there are no other questions, I'm happy to yield the rest of my time. Thank you, counsel. Thank you. Thank you, Your Honors. If you look at ER page 22, the fee award order, the district court when awarding Mr. Dobin a $5,000 incentive award did not analyze the PSRA at all, did not make any findings whether Mr. Dobin was qualified to represent the class. And if you look at ER 44, the preliminary approval order where the district court conditionally certified the class for settlement purposes, the district court appointed Mr. Dobin just by saying in one conclusory sentence that he bought Long Depot stock during the class period. Those are the factual findings that the district court made because they were wrong because the district court did not have the information necessary to make the statutory finding under the PSRA that Mr. Dobin can be entitled to a service award and that in the preliminary approval stage that Mr. Dobin could represent the class due to his in and out trader status. Now, this case is similar to Bluetooth in a sense that the fee order, the incentive award order, infects the entire final approval process of this proposal. I don't understand that. Why is that true? In Bluetooth, this court found that the trial court made an error as to whether to use a percentage method or use the low star method in awarding attorney's fees. And this court analyzed the fee order first before analyzing the final approval order and before reversing both and sending the entire case back to the district court. But you've been arguing about this representative award, not attorney fees. So, I mean, this is a $3.5 million settlement. This representative award was $5,000. So even if you were right that the $5,000 number was wrong, would we reverse this whole settlement for $3.5 million? Absolutely, because it was wrong because it violates the PSRA. Because the PSRA does not allow any recovery in addition to pro rata share, other than the cost and expenses directly relating to the representation of the class. That is in the federal statute. And Mr. Dobin could not have represented the class at all because he was an in-and-out trader. He would have, if he applied to become... So if we reject your argument that he's an in-and-out trader, does your argument then fall apart? Um, for the indicia of Mr. Dobin benefiting from the settlement, yes, if you find that Mr. Dobin's in-and-out trader status has nothing to do with his qualification to represent the class, we'll lose that indicia. But you cannot do that because case law is crystal clear that in-and-out traders cannot serve as a lead plaintiff. And we cited multiple cases on that point. And if Mr. Dobin... Why didn't you challenge him when the district court was considering preliminary approval? Because that issue was indeed not brief at all. And Mr. Dobin... I'm sorry, that issue was... That issue, the application for Mr. Dobin to apply to become a class representative at the preliminary approval stage for conditional certification, the only evidence that council put forth was that Mr. Dobin bought in the class period. And that's all the factual record that was before the district court. So you could have said, I object, I don't think that there's enough here to show that this person is qualified. We did not notice that issue from... And that issue obviously was an issue in our request for judicial notice that Mr. Dobin's in-and-out trader status was never raised. And it was apparent in another case, and not in this case, in the first case that Mr. Dobin filed. And, you know, I guess I wouldn't invoke what Justice Frankfurter said. Wisdom often don't come at all. And if it comes, you know, we shall not object it just because it comes late. I have a question on a different matter. Did you ever object to the district court applying the 25% benchmark for attorney fees? We objected to it, yes. And as a result... Tell me where in the record. What I understood is you objected to going over the 25% because they asked for 28%. I'm sorry, I misunderstood your question. We objected to an upward departure from 25% benchmark. We did not object to 25% itself. Thank you. Yes, so, you know, that... And with regard to the expert report, in the initial report, the statutory estimate damages under Section 11 was under one trader model was $0.67 million. When we challenged that analysis, the expert, Dr. Nye, submitted a supplemental report that's ER 524 that says, hey, the statutory damages was actually $56.79 million. Now, there are other problems and inaccuracies in the expert report. For example, class counsel alleged that the fees in... I'm sorry, the stock drop on May 10th was 22%. And Dr. Nye said that, oh, that 22% stock drop has 88.9% confidence level. But that stock drop was not used. You're actually a little bit over your time. I understand, I apologize. But we appreciate arguments by counsel for both sides. The matter's order submitted. Thank you, counsel. Thank you, Your Honors.
judges: NGUYEN, FORREST, VANDYKE